# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Lesly R. Travis, | File No. 11-cv-1808 (TNL) |
| Plaintiff, | |
| v. | **ORDER & MEMORANDUM** |
| Michael J. Astrue,<br>Commissioner of the Social Security<br>Administration, | |
| Defendant. | |

Laura S. Melnick, Southern Minnesota Regional Legal Services, Inc., 55 East Fifth Street, Suite 400, St. Paul, MN 55101 (for Plaintiff); and

David W. Fuller, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for Defendant).

---

Plaintiff Lesly R. Travis brings the present case, contesting Defendant Commissioner of Social Security's denial of her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. The parties have consented to a final judgment from the undersigned United States Magistrate Judge in accordance with 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D. Minn. LR 72.1(c). (Docket No. 8; *see also* Docket No. 11.)

This matter is before the Court on the parties' cross-motions for summary judgment. (Docket Nos. 9, 16.) Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's motion for summary judgment (Docket No. 9) is **GRANTED IN PART** and this matter **REMANDED** for further consideration pursuant to the fourth sentence of 42 U.S.C. § 405(g).

2. The Commissioner's motion for summary judgment (Docket No. 16) is **DENIED**.

3. The following memorandum is incorporated by reference.


**LET JUDGMENT BE ENTERED ACCORDINGLY**.



Date: September ___18___, 2012          _____*s/ Tony N. Leung*_____
                                        Tony N. Leung
                                        United States Magistrate Judge
                                        for the District of Minnesota

# I. Introduction & Procedural History

Plaintiff applied for DIB and SSI on April 29, 2008, stating she has been unable to work since March 14, 2008, due to "[d]isorders of the muscle, ligament, and fascia" and "[a]ffective/[m]ood disorders." (Tr. at 44-45.) Plaintiff's applications were denied initially and upon reconsideration. (Tr. at 44-46, 48-50, 53-54.) Plaintiff subsequently appealed the reconsideration determination by requesting a hearing before an administrative law judge ("ALJ"). (Tr. at 60.) On June 21, 2010, a hearing was held by video conference before ALJ Paul Lang. (Tr. at 9, 69, 76.) Plaintiff appeared along with counsel. (Tr. at 9.) On July 1, 2010, the ALJ concluded that Plaintiff has not been under a disability since April 29, 2008. (Tr. at 18.)

Plaintiff requested review of the ALJ's decision, which was subsequently denied by the Appeals Council. (Tr. at 1, 277-84.) Plaintiff brought this action on July 7, 2011. (Compl., Docket No. 1.) On September 8, 2011, the parties consented to the exercise of jurisdiction by the undersigned, and the Honorable Ann D. Montgomery, United States District Judge, subsequently referred this matter to the undersigned for all further proceedings pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Docket Nos. 8, 11.) Plaintiff moved for summary judgment on September 27, 2011. (Pl.'s Mot. for Summ. J., Docket No. 9.) The Commissioner moved for summary judgment on December 5, 2011. (Def.'s Mot. for Summ. J., Docket No. 18.)

## II. Facts

### A. Background

Beginning in 2003, Plaintiff was employed cleaning offices. (Tr. at 134.) From 2003 through March 14, 2008, Plaintiff worked approximately 35 hours per week. (Tr. at 122; *see also* Tr. at 618.) As of March 14, 2008, Plaintiff's hours were reduced to 15 hours per week upon the recommendation of a treatment provider.[1] (Tr. at 122, 127.) Plaintiff was terminated from her employment in October 2008. (*See* Tr. at 887.)

Since 2000, Plaintiff has sought treatment for headaches, fatigue, muscle pain, and neck pain. (*See, e.g.*, Tr. at 378-79, 387, 458, 477, 485, 490, 574; *see also* Tr. at 240-41.) Treatment providers observed that Plaintiff appeared anxious, overworked, and stressed due to financial instability. (*See, e.g.*, Tr. at 367-68, 377, 481, 490.) Plaintiff was typically prescribed stretching exercises, physical therapy, and pain medication. (*See, e.g.*, Tr. at 377, 383, 387, 406, 428, 482, 485-86, 488-89.)

Plaintiff's records also show that, as early as 2003, Plaintiff expressed concerns over her body odor. In February 2003, Plaintiff as seen by Joseph Moriarity, M.D., who noted:

> She states initially, she had hair that would have a distinct odor. She has changed shampoos and this has improved. However, she states that she will often shower two or three times a day. . . . She is concerned that people are talking about her body odor. This has never been an issue for her in the past.

(Tr. at 364.)

---

[1] It is not clear from the record who recommended that Plaintiff reduce her hours.

Significantly, Plaintiff was in a hit-and-run motor vehicle accident in December[2] 2003.  (*See* Tr. at 392, 492.)  Following the accident, Plaintiff regularly complained of having pain all over her body.  (*See, e.g.*, Tr. at 392, 490.)  Diagnostic evaluations, however, often produced mild or normal results.  (*See, e.g.*, Tr. at 431-32, 593-610, 614.)

In December 2004, Plaintiff was seen by Jeevan Paul, M.D., at the United Pain Center.  (Tr. at 495, 492.)  Plaintiff explained that, since the December 2003 car accident, "she has had pain all over her body."  (Tr. at 492.)  Plaintiff reported trouble sleeping and described her pain as "pinching, killing, exhausting, tight, annoying, continuous, steady, and constant."  (Tr. at 492.)  Plaintiff told Dr. Paul:

> Prior to the car accident, she could run for 3 hours at a time. Now, she can only walk, at the most, one-half mile.  Prior to that, she could easily sit for 4 hours.  Now, she can sit, at most, for 1 hour.  The pain interferes with every part of her life, including her work, household chores, recreation and leisure activity, exercise and sports, and relations with family and friends.

(Tr. at 492.)  Plaintiff also stated that her pain worsened with walking, fatigue, anxiety, stress, and noise.  (Tr. at 492.)  She also indicated that "it is very difficult for her to lie on either hip because of exquisite pain in both hips."  (Tr. at 492.)

Dr. Paul observed that Plaintiff's back neck muscles were "tender and tense" and that "[s]he has classic tender points of fibromyalgia all over her back, upper extremities, lower extremities."  (Tr. at 494.)  Dr. Paul also noted that Plaintiff had "a somewhat depressed mood" and tenderness in her left shoulder.  (Tr. at 494.)  Dr. Paul diagnosed

---

[2] The record is somewhat inconsistent on this point.  At one time, it seems Plaintiff reported that the accident occurred in November, (Tr. at 287), but the record most commonly refers to the accident as the December 2003 accident.  (*See, e.g.*, Tr. at 392, 492, 569, 571-72, 617.)

Plaintiff as having (1) "[c]hronic pain syndrome due to motor vehicle accident on December 3, 2003"; (2) "[f]ibromyalgia, triggered by the trauma of the motor vehicle accident"; (3) "[l]eft shoulder pain"; (4) "[m]ajor depression due to pain"; (5) "[i]nsomnia due to pain"; and (6) "[b]ilateral trochanteric bursitis." (Tr. at 494.)

Dr. Paul concluded:

> It is my opinion that the patient's entire pain problem is a result of her accident. It is documented in the literature that often fibromyalgia is triggered by an event or series of events. In this patient's case, who has no prior history of fibromyalgia, the onset of her muscle pain, the classic tender trigger points, and her current disability all date back to the motor vehicle accident 1 year ago.

(Tr. at 494.) Dr. Paul prescribed tramadol[3] and recommended that Plaintiff remain active. (Tr. at 494.)

Plaintiff saw Dr. Paul for a follow-up visit in February 2005. (Tr. at 490.) Plaintiff stated that the tramadol was too strong for her and she continues to be in pain and feel fatigued all of the time. (Tr. at 490.) Plaintiff told Dr. Paul that, because she does not have insurance, she can no longer come to the clinic for financial reasons. (Tr. at 490.) Dr. Paul advised Plaintiff to "exercise as much as possible" and noted that Plaintiff "does work a job which involves lots of walking, so she is able to get in some exercise that way." (Tr. at 490.)

Plaintiff sought additional treatment at the United Pain Center throughout 2005 and 2006. In July 2005, she was seen by Edrie J. Kioski, M.D. (Tr. at 488-89.) Plaintiff

---

[3] "Tramadol is used to relieve moderate to moderately severe pain." *Tramadol*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000960/ (last visited May 24, 2012).

told Dr. Kioski that she never filled the prescription from Dr. Paul because she is sensitive to medication and was worried about taking it. (Tr. at 488.) As for exercise, Plaintiff reported that she was walking and using a stationary bike. (Tr. at 488.) Dr. Kioski observed that Plaintiff "does have significant trigger points, particularly in the left trapezius muscle where there is a larger trigger point that is palpated. She has tenderness and tightness in the muscles in the supraspinatus and also in the rhomboids, both sides, but left is worse than right." (Tr. at 488.) Dr. Kioski prescribed Flexeril[4] and amitriptyline[5], and told Plaintiff to return in three months. (Tr. at 488-89.)

Plaintiff was seen by Lisa Michell Vollmer, M.D., at the United Pain Center in October 2005. (Tr. at 485-86.) Plaintiff's chief complaint was pain in her hips, low back, and feet. (Tr. at 485.) Plaintiff told Dr. Vollmer that "[s]he has completed 10 sessions of physical therapy and feels her neck pain is much better." (Tr. at 485.) Dr. Vollmer noted that Plaintiff "is continuing to work full time. Her car broke down recently, and she has had to walk 45 minutes a day to get to her work, which is exacerbating her pain as well." (Tr. at 485.) Dr. Vollmer started Plaintiff on naproxen[6]

---

[4] Flexeril is a brand name for cyclobenzaprine, a muscle relaxant. *Cyclobenzaprine*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000699/ (last visited May 24, 2012).

[5] "Amitriptyline is used to treat symptoms of depression. . . . [and] works by increasing the amounts of certain natural substances in the brain that are needed to maintain mental balance." *Amitriptyline*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000666/ (last visited May 24, 2012).

[6] "Prescription naproxen is used to relieve pain, tenderness, swelling, and stiffness . . . ." *Naproxen*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000526/ (last visited May 24, 2012).

and Prilosec[7] and continued Plaintiff's Flexeril and amitriptyline prescriptions. (Tr. at 485-86.)

In August 2006, Dr. Vollmer wrote a letter to the attorney representing Plaintiff in connection with her December 2003 accident. (Tr. at 569, 57-72.) Dr. Vollmer chronicled Plaintiff's medical conditions and attempted remedies. (Tr. at 571-72.) Dr. Vollmer opined that the accident exacerbated Plaintiff's neck and back pain and that Plaintiff will likely continue to suffer an increased level of pain as a result. (Tr. at 572.) Dr. Vollmer wrote that Plaintiff "may not be able to work full time, and she may have limitations on the amount she can bend, lift, stand, walk, [and] sit. The exact determinations of limits would be best determined by a functional capacity assessment." (Tr. at 572.) Dr. Voller opined that Plaintiff could work part to full-time, and stated that, from December 2004 through August 2006, "there were [not] any periods of time during which [Plaintiff] was totally disabled." (Tr. at 572.)

---

[7] Prilosec is a brand name for omeprazole and "is used alone or with other medications to treat gastroesophageal reflux disease." *Omeprazole*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000936/ (last visited May 24, 2012).

## B. Relevant Medical History[8]

### 1. 2007

In February, Plaintiff was seen at the HealthEast Midway Pain Center by L. Michael Espeland, M.D., and Reynald Forde, PA-C. (Tr. at 545.) Plaintiff reported having pain "in my neck, my back; I have pain all over." (Tr. at 545.) Plaintiff reported trouble sleeping and low energy, and rated her pain at 8. (Tr. at 545.) Plaintiff stated that she was working "as a housekeeper and cleans a school and a bank." (Tr. at 545.)

Forde's notes from this visit state that Plaintiff's "[n]eck is tender mostly in the paraspinous musculature" and that her "[c]ervical range of motion is only slightly diminished with complaints of pain." (Tr. at 546.) Forde also noted "tenderness . . . in the shoulder joints and tenderness is elicited in the back diffusely from the upper to lower with increasing pain in the left paraspinous muscles in the lumbar spine. Lumbar range of motion is also diminished in all fields with complaints of pain." (Tr. at 546.)

Forde assessed Plaintiff as having cervicalgia, low back pain, multi-site pain and arthralgias[9], and possible depression. (Tr. at 546.) Forde first recommended that Plaintiff participate in a chronic pain program, but Plaintiff stated she would not be able

---

[8] The record contains a series of handwritten records from various providers at West Side Community Health Services ("WSCHS"). (Tr. at 630-77.) The records are largely illegible. As best as this Court is able to tell, Plaintiff attended WSCHS from February 2004 through August 2008. (Tr. at 676, 630.) Plaintiff sought treatment for a variety of conditions, but most often the visits were in connection with her hypothyroidism (Tr. at 665, 662, 660, 658, 654, 643): back pain (Tr. at 675, 670, 639, 631); knee pain (Tr. at 673, 670, 652); hip pain (Tr. at 670, 645, 639); and neck pain (Tr. at 652, 645, 643, 641, 639, 637, 635, 633, 631). Plaintiff was most often seen by Angela Vargas, M.D. (Tr. at 674, 671, 66, 645, 643, 641, 639, 637, 635, 633, 630-31.)

Dr. Vargas ordered an MRI of Plaintiff's left knee in July 2004. (Tr. at 673-74.) The MRI uncovered no irregularities in Plaintiff's knee. (Tr. at 672.) In addition, Plaintiff received two notes excusing from her work during this period; neither excused Plaintiff for more than two days. (Tr. at 649, 656.) Plaintiff was most often recommended physical therapy for pain management. (Tr. at 675, 653, 648.)

[9] Arthralgia is pain and stiffness in the joints. *Joint Pain*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0003745/ (last visited May 24, 2012).

to on account of her work schedule. (Tr. at 546-47.) When Forde suggested an alternative program, Plaintiff told him that she does not drive very far on account of her last accident. (Tr. at 547.) Plaintiff told Forde that she was not depressed when he recommended that she see a psychologist. (Tr. at 547.) Ultimately, Plaintiff was agreeable to trying a prescription for Lyrica.[10]

Plaintiff saw Dr. Vollmer twice in May. During the first visit, Plaintiff reported increased neck pain and back pain. Plaintiff stated that she is not progressing in physical therapy and has difficulty working due to pain. (Tr. at 565.) Dr. Vollmer noted that Plaintiff was "tender to palpation along her entire spine. . . [and] tender over occiput bilaterally." (Tr. at 565.) Dr. Vollmer prescribed Topamax[11] and advised Plaintiff to schedule occipital nerve blocks as well as lumbar facet injections. (Tr. at 565.) Dr. Vollmer also recommended that Plaintiff continue physical therapy. (Tr. at 566.)

When Plaintiff returned at the end of the month, she was still having pain in her upper, mid, and lower back. (Tr. at 560.) Plaintiff stated that she did not pursue the nerve blocks or facet injections due to a lack of insurance. (Tr. at 560.) Plaintiff was again tender over her entire spine. (Tr. at 561.) Dr. Vollmer prescribed a lower dose of Topamax and also prescribed trazodone.[12]

---

[10] Lyrica is a brand name for pregabalin, which "is used to relieve neuropathic pain (pain from damaged nerves) that can occur in your arms, hands, fingers, legs, feet." *Pregabalin*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000327/ (last visited May 24, 2012).

[11] Topamax is a brand name for topiramate, which is used, among other things, to prevent migraine headaches. *Topiramate*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000998/ (last visited May 25, 2012).

[12] Trazodone is typically used to treat depression and "works by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance." *Trazodone*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000530/ (last visited May 25, 2012).

When Plaintiff saw Dr. Vollmer again in June, she stated that her pain "is 'not too bad' and 'just her low back, knees and toes.'" (Tr. at 556.) Plaintiff stopped taking Topamax because it increased her headaches. (Tr. at 556.) Plaintiff also told Dr. Vollmer that she frequently has to call in sick to her second job on account of pain. (Tr. at 556.) Plaintiff agreed to try Topamax again at a lower dose and Dr. Vollmer continued her trazodone prescription. (Tr. at 557.) Dr. Vollmer also talked about the need to treat Plaintiff's mental health. (Tr. at 557.)

Plaintiff saw Dr. Vollmer again in July. (Tr. at 550.) Plaintiff reported bilateral posterior neck pain, left-side ribcage pain, and trouble sleeping at night. (Tr. at 551.) Plaintiff also stated that she stopped taking Topamax because it "caused the 'veins in her arms to enlarge,'" and trazodone, because it made her feel "wired" during the day. (Tr. at 551.) Dr. Vollmer prescribed Vistaril[13] and Skelaxin[14] and recommend that Plaintiff follow up with her primary care provider to treat her anxiety. (Tr. at 552.) Dr. Vollmer noted that Plaintiff was referred back to her primary care provider for further treatment because "at this point she is only building debt and what this clinic has to offer her is limited in her current situation." (Tr. at 552.)

---

[13] Vistaril is a brand name for hydroxyzine, and "is used to relieve the itching caused by allergies and to control the nausea and vomiting caused by various conditions, including motion sickness. It is also used for anxiety . . . ." *Hydroxyzine*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000796/ (last visited May 25, 2012).

[14] Skelaxin is a brand name for metaxalone. *Metaxalone*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000543/ (last visited Sept. 9, 2012). Metaxalone is "a muscle relaxant, [and] is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries." *Id.*

In December, an MRI was taken of Plaintiff's cervical vertebrae.[15]  (Tr. at 591.)

The MRI showed "[o]nly minimal degenerative changes at several levels without associated central canal or neural foraminal stenosis."  (Tr. at 591.)

### 2.  2008

On January 2, 2008, Plaintiff was seen at the United Family Practice Health Center by Cora Peine, PA-C, for left ear pain.  (Tr. at 304; *see* Tr. at 796.)  Plaintiff also reported that she has temporomandibular joint disorder ("TMJ") and suffers from chronic pain related to a car accident.  (Tr. at 304.)  Peine observed clicking in Plaintiff's jaw and recommended that she see a dentist.  (Tr. at 304.)  Peine attributed Plaintiff's ear pain to the TMJ.  (Tr. at 304.)  Peine also noted that Plaintiff "does not make eye contact" and "appears very sad."  (Tr. at 304.)  Peine listed depression as a diagnosis, and wrote that she is "concerned about depression secondary to the amount of pain that [Plaintiff] is in." (Tr. at 304.)  Peine provided Plaintiff with the phone number for a psychologist.  (Tr. at 304.)

In February, Plaintiff went to the emergency department of Regions Hospital with exacerbated neck pain.  (Tr. at 287, 584-90.)  She was seen by Barbara Letourneau, M.D., and Danielle M. Jackson, M.D.  (Tr. at 287-88.)  Plaintiff stated that, since the accident in 2003, "she has been having chronic neck, upper, and lower back pain with associated paresthesias."  (Tr. at 287.)  Plaintiff stated that the pain severely impaired her daily activities.  (Tr. at 287.)

---

[15] The cervical vertebrae are "the seven bones in the neck area."  *Neck X-Ray*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0004262/ (last visited May 25, 2012).

Dr. Jackson noted that Plaintiff has been treated by her primary physician, pain clinic, and physical therapist for her pain, but was no longer being seen at the pain clinic due to lack of insurance. (Tr. at 287.) Dr. Jackson also observed "significant tenderness and muscle spasm to palpation throughout the right trapezius upon its insertion into the occiput and in the suprascapular region." (Tr. at 287.) Dr. Letourneau noted that Plaintiff "moves neck with no apparent difficulty," "is able to sit independently with no apparent problem," and "[t]here is no palpable spasm to her neck or back." (Tr. at 588.) Plaintiff was given 15 Vicodin tablets and discharged. (Tr. at 287.)

At the end of February, Thomas H. McPartlin, M.D., performed an independent medical examination of Plaintiff in connection with the litigation arising out of the December 2003 car accident. (Tr. at 617, 627.) Plaintiff told Dr. McPartlin that, as a result of the accident, her migraine headaches returned and she was no longer able to jog more than 15 minutes without pain whereas she had previously been able to jog two hours at a time. (Tr. at 617.) Plaintiff stated that her headaches would "spread to the neck, arm and shoulder and then down her body to her legs over the course of a day." (Tr. at 617.) Plaintiff told Dr. McPartlin that her headaches would last between two and three days, gradually worsening. (Tr. at 617.) Plaintiff also reported that sometimes her eyes would become "tender" and the pain in her head would "become severe and sharp." (Tr. at 617.)

In addition, Plaintiff reported "continual pain in the calves and soles of her feet as well as lateral hips, low back and posterior head and arms . . . of a moderate level." (Tr. at 618.) Plaintiff described the pain as feeling "as if she has had a heavily exercised

muscle" and stated that the pain concentrates in her low and upper back, arms, and shoulders. (Tr. at 618.) Plaintiff's pain bothers her while she is engaged in activity and is somewhat alleviated by heat. (Tr. at 618.) Plaintiff also noted that her fingers and toes tingled. (Tr. at 618.) Plaintiff also stated that "she seems somewhat slow to be able to understand things such as when given instructions at physical therapy." (Tr. at 618.)

Following the examination, Plaintiff mailed a note to Dr. McPartlin, clarifying that the pain in her neck, should, and back of her head is "a sharp pain and the rest of her body is 'pain with pressure.'" (Tr. at 618.) Plaintiff indicated that "every activity causes pain." (Tr. at 618.) Plaintiff also reported that her pain causes her to feel "congested."

Dr. McPartlin noted that, at the time, Plaintiff was cleaning businesses approximately 35 hours per week, which included light lifting and use of a vacuum cleaner. (Tr. at 618.) Dr. McPartlin observed that Plaintiff's reflexes are normal and that her muscle tone and bulk are normal as well. (Tr. at 619.) Dr. McPartlin noted that Plaintiff has "a very prominent 'collapse reaction' when strength testing is done and this is present in all limbs." (Tr. at 619.)

As for Plaintiff's neck, Dr. McPartlin observed:

> She has a marked decrease in range of motion to her neck and is very predominantly tender in all areas of the neck and back but this is just as apparent to very light touching the skin as it is to deep palpation. Pain-related behavior is noted to be absent both during the interview and during the exam even when she mentions that things are tender to touch. Pain-related behavior is not noted when sitting . . . .

(Tr. at 619.) He also reviewed Plaintiff's medical records. (*See* Tr. at 619-26.)

Dr. McPartlin ultimately concluded that Plaintiff "has had an abundance of findings and complaints with little in the way of objective findings." (Tr. at 626.) Dr. McPartlin noted that Plaintiff's complaint of "returning" headaches was contradicted by her medical records which showed Plaintiff seeking treatment for headaches in 2000 and February 2003. (Tr. at 626.) Dr. McPartlin also noted that, when Plaintiff was examined by an orthopedist approximately ten days after the December 2003 accident, Plaintiff had only mild tenderness and some spasm in her neck with a 50% reduction in range of motion, but Plaintiff's shoulder motion was normal. (Tr. at 626.) Approximately four months after the accident, Plaintiff was seen by her family doctor, who noted "full range of motion." (Tr. at 626.)

Dr. McPartlin opined that

> [t]here is symptom exaggeration, there are no objective findings on examination today, [Plaintiff] has symptoms that are bizarre in nature, and while she may in fact have migraine, she had it before the accident and had it returned to her after years of abeyance but that return of symptoms also occurred before the accident. . . . [Plaintiff] has been allowed to unduly focus on her symptoms, unfortunately, and these symptoms do not have an organic basis. She needs no treatment at this point . . . . There is no disability from the accident or need to limit activities or can I justify the need to limit activities past two weeks following the accident.

(Tr. at 627.)

On April 1, Plaintiff began seeing Paula Coyne, M.A., L.P., at the United Family Practice Health Center for trauma stemming from the 2003 accident. (Tr. at 320.) Plaintiff reported a fear of highway driving since the accident. (Tr. at 320.) Plaintiff also stated that, since the accident, she has been diagnosed with fibromyalgia and has had lots

of pain and other health issues. (Tr. at 320.) Plaintiff reported having pain in her back, neck, shoulders, hands, and feet as well as headaches. (Tr. at 321.)

During the initial intake, Coyne noted that Plaintiff attends physical therapy once or twice per month. (Tr. at 321.) Coyne also noted that Plaintiff "has severe financial problems due to all this medical debt and limited ability to work. She says she keeps looking for work but has limited choices because she has to confine herself to a small area because of her driving phobia." (Tr.at 321.) Coyne describe Plaintiff as

> clearly experiencing some symptoms of depression and marked anxiety which are affecting her functioning. It seems that her dysfunction has been more acute in the past but now has become chronic. Her range of functioning has become more constricted due to symptoms of depression and anxiety, and in addition to the chronic pain.

(Tr. at 322.) Coyne concluded that Plaintiff had a specific phobia to highway driving and posttraumatic stress disorder, ruling out depression not otherwise specified or other depressive disorder. (Tr. at 322.) Coyne also noted the following health conditions: preexisting diagnoses of fibromyalgia and chronic pain associated with the 2003 accident and hormone replacement therapy. (Tr. at 322.)

Plaintiff saw Coyne again on April 16 and Coyne added depression to her list of diagnoses. (Tr. at 318-19.) Coyne worked on cognitive behavioral therapy[16] ("CBT") techniques and breathing exercises with Plaintiff. (Tr. at 319.) Coyne listed Plaintiff's level of functioning as "fair." (Tr. at 318.) Plaintiff returned on April 25. (Tr. at 316.) Plaintiff discussed having trouble with her left eye. Coyne and Plaintiff continued to

---

[16] Cognitive behavioral therapy "is a problem-oriented treatment" that "helps in recognizing current problems and finding solutions to them." *Cognitive Behavioral Therapy at a Glance*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0016283/ (last visited May 3, 2012).

16

work on the CBT and breathing skills.  (*See* Tr. at 317.)  Coyne also referred Plaintiff to Dana Brian, M.D., for medication.  (Tr. at 317; *see* Tr. at 716.)  Coyne categorized Plaintiff's level of functioning as "poor."  (Tr. at 316.)

Plaintiff was seen by Dr. Brian at the United Family Practice Health Center on May 9.  (Tr. at 310.)  Dr. Brian started Plaintiff on Celexa,[17] Prevacid,[18] Ultram,[19] and Klonipin.[20]  (Tr. at 311.)

Plaintiff was seen on May 9 by William Kuglar, D.P.M., for an evaluation of her foot and leg pain.  (Tr. at 294.)  Kuglar was not able to correlate Plaintiff's symptoms to a specific pathology, but believed Plaintiff's pain was associated with her low back pain.  (Tr. at 295.)  Kuglar told Plaintiff to continue with physical therapy and see if her symptoms improve.  (Tr. at 295.)

On May 23, Plaintiff had another appointment with Dr. Brian.  (Tr. at 303.)  Dr. Brian assessed Plaintiff as having posttraumatic stress disorder, generalized anxiety disorder, a specific phobia to driving, and chronic pain syndrome.  (Tr. at 303.)  Among other things, Dr. Brian recommend that Plaintiff continue her Klonipin prescription and take Lexapro[21].

---

[17] Celexa is a brand name for citalopram and is used to treat depression.  *Citalopram*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001041/ (last visited May 3, 2012).

[18] Prevacid is a brand name for lansoprazole and "is used to treat gastroesophageal reflux disease" by "decreasing the amount of acid made in the stomach."  *Lansoprazole*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000964/ (last visited May 3, 2012).

[19] Ultram is a brand name for tramadol, a medication "used to relieve moderate to moderately severe pain."  *Tramadol*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000960/ (last visited May 3, 2012).

[20] Klonipin is a brand name for clonazepam, which is used to relieve panic attacks and "works by decreasing abnormal electrical activity in the brain."  *Clonazepam*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000635/ (last visited May 2, 2012).

[21] Lexapro is a brand name for escitalopram, which "is used to treat depression and generalized anxiety disorder (GAD; excessive worry and tension that disrupts daily life and lasts for 6 months or longer)."  *Escitalopram*,

Plaintiff saw Coyne three times in May and they continued to work on CBT skills. (Tr. at 315, 313; *see* Tr. at 309.) These visits also focused on Plaintiff's driving phobia. (Tr. at 309, 312-13, 315.) Coyne rated Plaintiff's functionality between "poor" and "fair" and, towards the end of the month, noted that Plaintiff was showing some improvement. (Tr. at 314, 312, 308.)

During her June 1 visit with Coyne, Plaintiff reported having less anxiety but was stressed about her financial situation as she was not receiving unemployment benefits. (Tr. at 306.) Plaintiff also stated that her pain had been worse. (Tr. at 307.) Plaintiff indicated that she was practicing her CBT skills and breathing exercises. (Tr. at 307.)

In June, Plaintiff also completed a function-report form, regarding "[h]ow [her] illnesses, injuries, or conditions limit [her] actions." (Tr. at 146; *see* Tr. at 153.) Plaintiff reported that she experiences pain all over her body and feels very tired. (Tr. at 149, 150.) Plaintiff stated that she has trouble with housework and has to take breaks. (Tr. at 148.) Plaintiff also stated that she takes breaks when cooking. (Tr. at 148.)

Plaintiff stated that she only leaves her apartment to go to work or buy groceries. (Tr. at 149, 150.) As for specific types of activities and tasks, Plaintiff described her ability to pay attention as "okay I guess" and stated that she did not have difficulty with written instructions, but sometimes had to have oral instructions repeated if she had not slept. (Tr. at 151.)

---

PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000214/ (last visited Sept. 9, 2012).

On July 11, Chang-Wuk Kang, M.D., completed a medical evaluation of Plaintiff in connection with her disability application. (Tr. at 324.) Dr. Kang found that Plaintiff had dysthymic disorder,[22] PTSD, and a fear of driving on highways. (Tr. at 324.) Dr. Kang concluded that the combination of these impairments did not equal a severe impairment under either 12.04 (affective disorders) or 12.06 (anxiety related disorders). (Tr. at 48.) *See* 20 C.F.R. pt. 404, subpt. P, app. 1. Dr. Kang concluded Plaintiff had mild difficulty in maintaining concentration, persistence, or pace, but otherwise did not have restrictions in her activities of daily living, difficulties in maintaining social functioning, or repeated episodes of decompensation of an extended duration, and that there was no evidence of the "C" criteria. (Tr. at 48.) *See* 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.04(B)-(C), 12.06(B)-(C).

Plaintiff was seen by Dr. Brian on July 14. (Tr. at 814.) Dr. Brian noted that Plaintiff

> is actually doing very well with [her anti-depressant medication] and feels much better, certainly looks better, more animated, less depressed. She says her anxiety is much better controlled but she has not yet been able to drive. . . . I do think she continues to be severely disabled by her PTSD, her agoraphobia, less by her chronic pain although that is an issue, but she is not able to follow through with some of the recommendations for physical therapy because she has no insurance now and no income except for a 15 hour a week job that is within walking distance for her . . . , but I really would doubt that she is going to be able to work much beyond that in terms of hours, and is still not able to transport herself.

(Tr. at 814.)

---

[22] Dysthymia, or dysthymic disorder, "is a chronic type of depression in which a person's moods are regularly low," but "symptoms are not as severe as with major depression." *Dysthymia*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001916/ (last visited May 4, 2012).

In the months of June and July, Plaintiff had three visits with Coyne. (Tr. at 898-903.) Initially, Coyne noted that Plaintiff's mood was a little bit better. (Tr. at 902.) During the next two visits, however, Plaintiff was very stressed and worried about her financial situation. (Tr. at 898, 900.) Coyne also noted that Plaintiff is unable to work due to pain. (Tr. at 900, 903.) During this time, Coyne worked on breathing and relaxation skills. (Tr. at 899, 901.)

On August 8, state agency medical consultant Charles T. Grant, M.D., completed a physical residual functional capacity assessment of Plaintiff. (Tr. at 337, 344.) With respect to Plaintiff's exertional limitations, Dr. Grant concluded Plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk for approximately 6 hours in an 8-hour workday, sit for approximately 6 hours in an 8-hour workday, and was otherwise unlimited in her ability to push and/or pull. (Tr. at 338.) Dr. Grant noted that "[t]he available medical record is insufficient to establish a severe impairment and the claimant's symptoms are disproportionate to objective findings, but they are partially credible and reduce the [residual functional capacity] to medium." (Tr. at 339.) Dr. Grant did not find any postural, manipulative, visual, communicative, or environmental limitations. (Tr. at 340-42.)

During the months of September and October, Plaintiff met with Coyne four times. Plaintiff continued to stress over her financial situation. (Tr. at 887, 893, 896; *see* 889.) Coyne noted that Plaintiff was depressed, anxious/worried, easily fatigued, having difficulty sleeping, and suffering from chronic pain. (Tr. at 887, 889, 893, 896.) Coyne continued to work on relaxation and mindfulness exercises with Plaintiff. (Tr. at 890,

894, 897.)  At the October 16 appointment, Coyne noted that Plaintiff was fired.  (Tr. at 887.)

Coyne also wrote three letters in support of Plaintiff during this time.  The first letter addressed Plaintiff's desire to work more and appears to be directed at a future employer.  (Tr. at 895.)  Coyne noted that Plaintiff suffered from and was currently seeking treatment for a phobia of driving on highways, severe chronic pain, depression, and anxiety.  (Tr. at 895.)  Coyne supported Plaintiff's attempt to work more, but stated that additional work would need to be on a trial basis.  (Tr. at 895.)  Coyne also noted that Plaintiff was in danger of losing her housing while waiting for unemployment benefits.  (Tr. at 895.)

The second letter was in connection with Plaintiff's unemployment benefits.  (Tr. at 892, 894.)  Coyne stated that Plaintiff "continues to be very ill from chronic pain and anxiety" and "has been incapacitated most every day for two weeks during this past month."  (Tr. at 892.)  Coyne stated that, while Plaintiff wanted to attempt working more hours, she has not been able to do so and Coyne does not recommend that she work more than 15 hours per week.  (Tr. at 892.)

The third letter also appears to be directed to a future employer.  (Tr. at 891.)  Coyne again recounts Plaintiff's phobia, pain, depression, and anxiety.  (Tr. at 891.)  Coyne goes on to state that "[b]ecause of her desperate financial situation, [Plaintiff] plans to return to work 38 hours per week despite her disabilities."  (Tr. at 891.)  Coyne noted that Plaintiff would need employment that was close to her home and did not require lifting more than 20 pounds.  (Tr. at 891.)

Plaintiff completed another function report in October. (Tr. at 195, 202.) Plaintiff again reported difficulty with household chores and the need for breaks and stated that she does not cook when she is in pain. (Tr. at 196-97.) This time, however, Plaintiff stated that she is able to pay attention for a "long period of time" and that she follows both written and oral instructions "well." (Tr. at 200.)

Plaintiff's next visit with Dr. Brian was on October 30. Plaintiff stated that her neck and head pain had increased over the past week. (Tr. at 811.) Plaintiff also had complaints of pain in her shoulder, left hip, and sacroiliac joint. (Tr. at 811.) Dr. Brian noted that Plaintiff "is feeling markedly improved in terms of her PTSD, saying that this is the best she has felt since her accident." (Tr. at 811.) Dr. Brian also noted that Plaintiff was feeling "much improved" with the anxiety medication. (Tr. at 811.) Dr. Brian continued Plaintiff's Lexapro and Klonopin prescriptions and gave Plaintiff a referral for physical therapy. (Tr. at 811.)

Plaintiff saw Coyne once in November. (Tr. at 885.) Plaintiff continued to stress over her financial situation. (Tr. at 885.) Coyne reinforced Plaintiff's attempts to seek out resources and worked on stress and pain-management techniques. (Tr. at 886.) Coyne also noted that she would support Plaintiff's application for disability benefits. (Tr. at 886.)

Plaintiff had three sessions with Coyne in December. (Tr. at 879, 881, 883.) During these sessions, Coyne noted that Plaintiff was depressed, anxious/worried, having difficulty sleeping, and experiencing chronic pain. (Tr. at 879, 881, 883.) During her December 2 session, Plaintiff reported that her roommate was in a car accident in

Plaintiff's car in which her roommate was injured and the car totaled. (Tr. at 883.) Plaintiff experienced a great deal of pain and stress. (Tr. at 883.) Coyne worked with Plaintiff on relaxation techniques and discussed plans for obtaining resources and services. (Tr. at 884.)

Plaintiff's two other sessions also focused on Plaintiff's financial concerns and managing stress. (Tr. at 879-82.) During the December 19 session, Plaintiff reported that she felt harassed by her neighbors. (Tr. at 881.) At the December 31 session, Coyne noted that Plaintiff appeared preoccupied with smells and was "very sensitive to smell." (Tr. at 879.)

### 3. 2009

On January 5, Gregory H. Salmi, M.D., affirmed Dr. Grant's physical-residual-functional-capacity assessment. (Tr. at 353.) The same day, Ray M. Conroe, Ph.D., L.P., affirmed Dr. Kang's assessment of Plaintiff's mental health. (Tr. at 355.)

Plaintiff returned to the United Family Practice Health Center for refills of her medication in early January. (Tr. at 808.) Plaintiff was seen by Jessica Jandric, PA-C. (Tr. at 809.) Jandric noted that, in addition to the medication refills, Plaintiff also requested a referral to a pain clinic, but it was ultimately decided that Plaintiff would be referred to Mark C. Agre, M.D., M.S., at Impact Physical Medicine & Aquatic Center ("Impact"). (Tr. at 715-16, 809.) Plaintiff reported no changes in her back and shoulder pain and, upon examination, Jandric observed: "Inspection of back reveals no obvious abnormalities. Flexison and extension is good. Tenderness of the SI joints bilaterally;

however, no midline tenderness.  Straight leg testing is negative.  Deep tendon reflexes are intact and symmetric." (Tr. at 808.)

Dr. Brian subsequently referred Plaintiff to the Impact Physical Medicine & Aquatic Center ("Impact"), where she was seen by Mark C. Agre, M.D., M.S., on January 8, 2009.  (Tr. at 715-16.)  Plaintiff described "pretty much total body pain" with her back, head, and jaw being the worst.  (Tr. at 716.)  Plaintiff also stated that her pain varied from 3 to 9.  (Tr. at 716.)  Plaintiff told Dr. Agre that she has difficulty sitting for a long time, needing to change positions, and she can stand only for about 30 minutes.  (Tr. at 717.)  Plaintiff reported that "[s]he finds herself doing a lot of laying around," but does do her exercises as well as occasionally using a treadmill and elliptical trainer.  (Tr. at 717.)

Plaintiff also completed an intake questionnaire.  (Tr. at 720.)  Plaintiff noted that her pain had worsened since 2003.  (Tr. at 720.)  Plaintiff stated that her pain was worse when she was lying on her stomach, back, or side; kneeling; squatting; sitting; bending; lifting or carrying; twisting; looking up, down, or to the left; driving; and reaching overhead or to the floor.  (Tr. at 722.)  Plaintiff reported that she could sit and stand for 30 minutes and could walk for one-half mile.  (Tr. at 722.)  In a separate questionnaire, Plaintiff stated that she could stand without limitation and that her pain is neither getting better or worse.  (Tr. at 724.)

Dr. Agre concluded that Plaintiff "is a bit hypermobile and pretty deconditioned. She has cervical/thoracic, face/head pain more so than lumbosacral. . . . She may or may not have some TMJ issues." (Tr. at 718.)  Dr. Agre recommended Plaintiff undergo both

land and pool occupational therapy in order to strengthen her core.  (Tr. at 718.)  While Dr. Agre recommended 10 or 20 sessions, he noted that Plaintiff's insurance would expire in approximately three months and therapy likely would not continue.  (Tr. at 718.)  If occupational therapy was not effective, Dr. Agre suggested Plaintiff undergo "physical therapy for trial cervical traction."  (Tr. at 718.)

In mid-January, Plaintiff started a therapeutic regimen with Impact consisting of occupational, water-resisted, and physical therapy.  (Tr. at 710-680.)  Plaintiff completed six sessions of occupational therapy and four sessions of water-resisted therapy during the first month.  (Tr. at 710-02.)  Overall, Plaintiff reported that she felt better following therapy and for the next few days, but was often sore and had suffered episodes during which her neck, shoulder, and back pain were so severe that she felt physically ill and needed to stay in bed.  (*See* Tr. at 709-02.)

In early February, with the assistance of counsel, Plaintiff completed a disability report in connection with her appeal.  (Tr. at 212.)  Plaintiff reported that her pain was more severe, her headaches were more intense, and her ability to sleep was further reduced, making her feel tired and causing her to be clumsy.  (Tr. at 207.)  Plaintiff also reported trouble with her memory.  (Tr. at 207.)  Plaintiff stated that she does not go out any more and has burned herself lately when trying to cook.  (Tr. at 211.)  Plaintiff still struggled with household chores and now moved more slowly due to pain.  (Tr. at 211.)

On February 12, Coyne wrote a letter regarding Plaintiff's ability to participate in jury duty.  (Tr. at 878.)  Coyne stated that Plaintiff "has some chronic pain, physical[,] and mental health challenges that often keep her from participating in may activities" and

that "[s]he may be unable to participate in jury duty."  (Tr. at 878.)  On February 16, Coyne wrote a letter in support of Plaintiff continuing to receive benefits, stating that Plaintiff "continues to suffer from chronic physical pain and mental health challenges. She continues to be disabled from working, though she would much prefer to be working."  (Tr. at 875.)

Plaintiff began physical therapy in mid-February.  (Tr. at 695-96.)  As part of the physical therapy evaluation, Plaintiff reported that it was easier for her to sit rather than stand, but her ability to maintain either position was limited.  (Tr. at 696.)  Plaintiff stated that she could sit for 30 minutes, stand for 30 to 40 minutes, and walk approximately 3 to 4 blocks.  (Tr. at 696.)  Plaintiff reported "constant pain," ranging from 3 to 9.  (Tr. at 696.)  Plaintiff also indicated that she had difficulty vacuuming and cleaning.  (Tr. at 696.)

Plaintiff had an additional twelve sessions between the end of February and the end of April, six water-resisted, three physical, and three occupational sessions.  (Tr. at 680-94.)   While Plaintiff's overall symptoms oscillated during this period, Plaintiff experienced the most improvement in her neck pain.  (*See* Tr. at 681, 684-87, 692.)

In March, Dr. Agre performed a follow-up examination, noting that Plaintiff has noticed significant improvements in her upper body, but still has difficulty with her lower body.  (Tr. at 688.)  Dr. Agree observed that Plaintiff is

> quite tender at the facets particularly on the left mid cervical spine.  She has trochanteric prominence or bursal pain on the left.  Her lumbar pain is worse with extension, rotation/extension, and appears facet mediated.

(Tr. at 688.)  Dr. Agre also noted that he provided Plaintiff with a sample of slow-release Ultram due to Plaintiff's sensitivity to medication.  (Tr. at 688.)

During roughly the same period of time, Plaintiff had five visits with Coyne.  (*See* Tr. at 865, 867, 869, 871, 873.)   Coyne consistently observed that Plaintiff was sad/depressed, had low self-esteem, suffered from anxiety, and experienced chronic pain. (Tr. at 865, 867, 869, 871, 873.)   Coyne described Plaintiff's level of functioning between poor and fair.  (Tr. at 865, 867, 869, 871, 873.)  At Plaintiff's April 27 visit, Plaintiff told Coyne that she had been in bed for three days due to intense hip and leg pain.  (Tr. at 865.)

At the end of April, Dr. Agre evaluated Plaintiff again.  (Tr. at 773.)  Dr. Agre noted that, while Plaintiff's upper body continues to improve, Plaintiff "continues having hip lumbar lower extremity problems."  (Tr. at 773.)   Dr. Agre approved additional sessions of occupational therapy, but "recommend[ed] discontinuing if no progress is seen in the next few sessions." (Tr. at 774.)  Dr. Agre opined that Plaintiff "will continue to have chronic pain" and "recommend[ed Plaintiff] follow her home exercises as taught by her therapists." (Tr. at 774.)

Between the end of April and early November, Plaintiff had 23 sessions of occupational therapy.  (*See* Tr. at 752-72, 776.)  Plaintiff's therapist used a new technique in many of these sessions with positive results.  (*See, e.g.*, Tr. at 759-60, 762-63, 765, 771.)  Plaintiff reported the most improvement in her neck pain.  (*See, e.g.*, Tr. at 760, 768-69.)  Plaintiff experienced "good days" and "bad days" and her therapist noted that Plaintiff was not yet consistently pain-free.  (Tr. at 753; *see, e.g.*, Tr. at 762-63, 767-98.)

Plaintiff had three sessions with Coyne in the months of May and June. Coyne continued to note that Plaintiff was sad/depressed, had low self-esteem, suffered from anxiety, and experienced chronic pain. (Tr. at 859, 861, 863.) Coyne also continued to rate Plaintiff's level of functioning between poor and fair. (Tr. at 859, 861, 863.)

Plaintiff next saw Dr. Brian on June 4. (Tr. at 801.) Dr. Brian noted that Plaintiff was currently taking Lexapro and, while her anxiety had improved, Plaintiff's depression was not as improved as Dr. Brian would like it to be. (Tr. at 801.) Dr. Brian also noted that Plaintiff was not sleeping well and continued to have "multiple somatic complaints of pain." (Tr. at 801.) Dr. Brian gave her a short-term prescription for Vicodin and another referral to Impact and Dr. Agre for continued physical therapy. (Tr. at 802.)

On June 18, Plaintiff returned to the United Family Practice Health Center for a follow-up appointment regarding some gastrointestinal issues. (Tr. at 800, 805-07.) The treatment notes indicate that Plaintiff "has been diagnosed with fibromyalgia in the past and she really has classic fibromyalgia in the classic trigger points . . . She has had more fatigue, soaking night sweats when she has a lot of pain and pain that causes chills and sweating." (Tr. at 800.)

During her three visits with Coyne between July and August, Plaintiff continued to show symptoms of sadness/depression, low self-esteem, and anxiety and also experienced chronic pain. (Tr. at 853, 855, 857.) Plaintiff's level of functioning also remained the same, oscillating between poor and fair. (Tr. at 853, 855, 857.)

In August, Plaintiff saw Peine at the United Family Practice Health Center for gastrointestinal problems and chronic pain. (Tr. at 796.) For Plaintiff's fibromyalgia,

Peine recommended that Plaintiff take Klonipin twice a day, instead of just once a day, on those days where she was experiencing more pain. (Tr. at 796.)

Plaintiff returned in late September and late October with additional complaints of acid reflux and abdominal pain. (Tr. at 793-94.) Peine noted Plaintiff's history of stomach problems. (Tr. at 793-94.) Peine recommended over-the-counter fiber and acid reduction remedies and suggested that Plaintiff take her Prilosec in the morning and her thyroid medication in the evening. (Tr. at 794.)

During the months of September, October, and November, Plaintiff attended six sessions with Coyne. (Tr. at 842, 844, 846-47, 849, 851.) Coyne noted that Plaintiff continued experiencing sadness/depression, low self-esteem, anxiety, and some chronic pain and her level of functioning was still between poor and fair. (Tr. at 842, 844, 846-47, 849, 851.) Plaintiff also suffered from sleep disturbance. (Tr. at 842, 844, 846-47, 851.) Coyne's notes from this time period indicate that Plaintiff's pain and health issues limited her ability to function, (Tr. at 851); Plaintiff was stressed over housing issues, (Tr. at 844, 846, 849, 847); and Plaintiff expressed concerns over her body odor, (Tr. at 843). On one occasion, Coyne also noted somatic symptoms.[23] (Tr. at 844.)

In mid-November, Plaintiff met with Dr. Agre for another evaluation. (Tr. at 748.) Dr. Agre noted that Plaintiff's progress has "definitely been positive," but Plaintiff experienced recent setbacks with "increased headache[,] neck pain[, and] some knee pain." (Tr. at 748.) Dr. Agre observed that Plaintiff was "[t]ender over her cervical

---

[23] "Somatoform pain disorder is pain that is severe enough to disrupt a person's everyday life. The pain is like that of a physical disorder, but no physical cause is found. . . [and] is thought to be due to psychological problems. *Somatoform pain disorder*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001920/ (last visited Sept. 10, 2012).

facets," particularly at the right C2-3. (Tr. at 748.) Dr. Agre noted that Plaintiff responded positively to cervical traction, but was not able to afford the equipment for herself. (Tr. at 748.) Dr. Agre prescribed propoxyphene[24] and recommended that plaintiff continue using diclofenac gel[25] and attending therapy. (Tr. at 749.)

Plaintiff had an additional five sessions of occupational therapy and was subsequently discharged after her progress "plateaued." (*See* Tr. at 738-42.) During her last visit with Dr. Agre, Plaintiff had complaints of ear pain. (Tr. at 738.) Dr. Agre examined Plaintiff's ears, which appeared normal. (Tr. at 738.)

In December, Plaintiff had two sessions with Coyne. Plaintiff continued to show symptoms of sadness/depression, low self-esteem, and anxiety as well as somatic symptoms. (Tr. at 838, 840.) Plaintiff also struggled to manage her chronic pain. (Tr. at 838, 840.)

On December 20, the prescription for Plaintiff's thyroid medication was renewed. (Tr. at 788.)

### 4. 2010

On January 13, Plaintiff was seen by Ana Patricia Groeschel, M.D., of Noran Neurological Clinic, P.A. (Tr. at 734.) Plaintiff sought treatment for headaches, earaches, facial pain, neck pain, and overall body pain. (Tr. at 734.) Plaintiff rated her pain between 5 and 9. (Tr. at 734.)

---

[24] Propoxyphene is an "opioid pain reliever used to treat mild to moderate pain [and was subsequently withdrawn] from the U.S. market at the request of the FDA, due to new data showing that the drug can cause serious toxicity to the heart, even when used at therapeutic doses." *Propoxyphene*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000649/ (last visited Aug. 22, 2012).

[25] This topical treatment relieves joint pain and "works by stopping the body's production of a substance that causes pain." *Diclofenac 1% Topical (osteoarthritis pain)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0004961/ (last visited September 10, 2012).

Dr. Groeschel stated her findings in a letter to Dr. Agre. (Tr. at 731-33.) Dr. Groeschel observed that Plaintiff had "mild decreased range of motion with flexion, extension and lateral flexion" in her neck as well as "tenderness in the C2 distribution, paracervical muscles and trapezius muscles." (Tr. at 732.) Dr. Groeschel noted that Plaintiff's muscle tone and proximal and distal strength were normal in both Plaintiff's upper and lower extremities with no evidence of atrophy. (Tr. at 732.) Plaintiff's reflexes were also normal and symmetrical. (Tr. at 732.)

In addition, Dr. Groeschel noted that Plaintiff's "[g]ait was normal with good stride, good arm swing, and good turning" and Plaintiff was able to "[w]alk[] on heels, toes, hop[]on each foot, squat[] and climb[] one stair." (Tr. at 733.) Due to a "new onset of facial pain," Dr. Groeschel recommended that Plaintiff have an MRI of her brain "to rule out an intracranial process as in a brainstem tumor." (Tr. at 733.) Dr. Groeschel also prescribed Neurontin[26] to alleviate Plaintiff's pain. (Tr. at 733.)

The MRI was performed on January 19. (Tr. at 730.) The MRI showed "[f]ew punctuate foci of T2 prolongation in the supratentorial white matter that are predominantly in the bilateral frontal subcortical white matter, nonspecific in appearance. Minimal apparent confluent T2 prolongation in the brain stem/pons, likely artifactual in etiology." (Tr. at 730.)

Plaintiff was seen by Christopher Geisler, PA-C, at the Noran Neurological Clinic on January 27 for a follow-up visit in connection with the MRI. (Tr. at 726.) Geisler

---

[26] Neurontin is a brand name for the drug gabapentin, which is used to control certain types of seizures and "the burning, stabbing pain or aches that may last for months or years after an attack of shingles." *Gabapentin*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000940/ (last visited Aug. 21, 2012).

observed that Plaintiff was "visibly uncomfortable," "made[] very poor eye contact," "h[eld] her head in her hands," "moan[ed] a bit," and "seemed almost a bit sedated and lethargic but she was alert and oriented." (Tr. at 727.) Geisler noted that he reviewed the MRI results with Plaintiff. (Tr. at 727.) Geisler's treatment notes state that he does "not know why [Plaintiff] is having such a difficult time" and that he "suspect[s] that she has a complicated pain syndrome as well as some psychiatric overlay." (Tr. at 727.) Geisler also noted that Plaintiff requested a prescription for oxycodone, but Geisler deferred to Plaintiff's primary doctor. (Tr. at 727.)

Plaintiff returned to the United Family Practice Health Center on February 19, again complaining of gastrointestinal issues. This time, Plaintiff was examined by Amy Schneider, M.D. (Tr. at 785.) Dr. Schneider noted that Plaintiff's abdominal exam was "completely benign" and she attempted to "discuss the fact that it seems that stress and psychological factors are likely a strong contributing factor." (Tr. at 784-85.)

Plaintiff saw Coyne twice in March. (Tr. at 834, 836.) Plaintiff continued to struggled with sadness/depression, anxiety, and chronic pain. (Tr. at 834, 836.) She had additional stress over her health issues, housing issues, and increasing pain. (Tr. at 836.) Plaintiff also reported that she was frequently falling and dropping things. (Tr. at 834.)

Plaintiff was next seen by Peine on April 8 with complaints of "jaw pain bilaterally, fatigue in jaw, associated with pain in eyes, ears and tingling in left jaw." (Tr. at 780.) Plaintiff reported that she consulted a dentist who thought her symptoms were related to TMJ and that she had previously seen a specialist who diagnosed her with TMJ.

(Tr. at 780.)  Peine observed clicking in Plaintiff's jaw and referred Plaintiff to a TMJ specialist.  (Tr. at 781-82.)

Plaintiff was seen by Peine on May 28 for a yearly exam.  (Tr. at 830.)  Plaintiff noted that she had fallen twice in the past few weeks and frequently dropped things.  (Tr. at 830.)  Plaintiff also reported that, although no one else has noticed, she "[f]eels like she smells of urine" and, as a result, she "[s]howers twice daily, changes clothes frequently[,] and cleans [the] bedsheets regularly."  (Tr. at 830.)  In addition, Plaintiff reported mouth pain, which could be attributed to dental work, but Plaintiff "also th[ought] someone is spraying pepper spray under her apartment door."  (Tr. at 830.)  Among other things, Peine listed Plaintiff's diagnoses as TMJ, generalized anxiety disorder, PTSD, fibromyalgia, dysthymic disorder, and joint pain in Plaintiff's forearm, wrist, neck, low back, leg, and thoracic spine.  (Tr. at 830.)

On June 3, 2010, Plaintiff saw Coyne for the last time due to a change in insurance.  (Tr. at 829.)  Coyne listed Plaintiff's diagnoses as generalized anxiety disorder, PTSD, and dysthymic disorder.  (Tr. at 828.)  Coyne noted that Plaintiff's condition had "[d]eteriorated" and that Plaintiff "seems to have increasing olfactory and paranoid delusional experiences, though she is in denial that they are delusional."  (Tr. at 828.)  Coyne observed that Plaintiff seemed

> [e]xtremely preoccupied with her experience of hearing neighbors say negative things about her between the walls; thinks the nurse downstairs is making her disabled neighbors do mean things to her; is convinced that someone put pepper spray on her doorknob and is spraying other chemicals near her door.  Is afraid to go outside because she says people are calling her bad names.  She said she had a 'nervous

> breakdown' yesterday at home. . . . She feels offended at any suggestions that this may be imaginary, amplified, or a manifestation of her depression of anxiety.

(Tr. at 828.) Coyne noted that Plaintiff was not on medication due to the insurance change and recommended that Plaintiff fill out the paperwork necessary to attend another clinic. (Tr. at 828-29.) In her progress notes, Coyne recommended that Plaintiff's new "health care provider consider a medication like seroquel or Risperdal to see if [Plaintiff's] olfactory hallucinations/extreme sensitivities might be alleviated" as "[t]hey are dominating her daily life experience and debilitating her." (Tr. at 829.)

Coyne completed a mental impairment questionnaire regarding her treatment of Plaintiff. (Tr. at 820.) Coyne noted that, since April 2008, she had seen Plaintiff on a weekly to monthly basis depending on Coyne's availability. (Tr. at 820.) Coyne noted that Plaintiff experienced, among other things, an increase in paranoia, auditory delusions and hallucinations, oddities of thought, and an "acute[] sensitiv[ity] to smells, [Plaintiff is] acutely worried about smells, believes she smells awful [and] avoids all contact with others, feels dirty." Coyne also stated that Plaintiff "is becoming increasingly hard to understand; her communication skills are deteriorating in large part because her own thinking has become distorted with paranoia, bizarre assumptions, [and] loose associations." (Tr. at 820.)

In addition, Coyne stated Plaintiff suffers from severe fatigue and is not able to handle the stress of an employment setting. Coyne noted that Plaintiff's "pain levels are disabling, which in turn exacerbate[s her] depression [and] anxiety." (Tr. at 821.) Coyne also stated that, at least one week per month, Plaintiff's symptoms are such that "she

pretty much can't get out of bed due to pain, fatigue, cramps, stomach issues." (Tr. at 821.) Coyne stated that Plaintiff's pain "exacerbates her [mental health] issues." (Tr. at 822.)

Coyne described Plaintiff's thinking as "often scrambled" and that Plaintiff's communication skills and ability to understand events and processes "are impacted by some English fluency issues/limitations, especially combined with anxiety and depression." (Tr. at 822.) Coyne described Plaintiff's mental ability and aptitude to perform unskilled work as "[p]oor or none" in nearly all categories and noted that regular attendance was a "very big problem" and Plaintiff would likely be absent more than three times per month. (Tr. at 822-23.) Coyne noted Plaintiff was "very socially phobic" and would have poor to no ability to interact appropriately with the public, travel in unfamiliar places, and use public transportation. (Tr. at 823.)

Coyne stated Plaintiff was extremely limited in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. at 824.) Coyne wrote that when she started treating Plaintiff, Plaintiff

> was still working [part time] doing janitorial work. She had pain issues, fatigue, [and] all symptoms were described. She missed work *all the time* due to her illnesses. She couldn't drive to work sites due to her phobias. She felt tormented by her supervisors [and] coworkers. As worried and depressed as she was about homelessness, having no money, having to depend on her roommate, about not being able to send [money] to her mother [and] niece, she decompensated [and] simply could not work due to her multiple disabilities.

(Tr. at 825.)

In a separate letter, Coyne wrote that Plaintiff has been having

more physical, balance[,] and coordination difficulties . . . ; she drops coffee and has burned herself several times, burns herself while cooking, she has fallen more than 4x recently getting in and out of the bathtub; and drops glasses and other items. She has severe ocular headaches that last for days at a time. The pain in her hands, feet, and throughout her body is disabling.

(Tr. at 817.) Coyne also wrote that Plaintiff "has increasing distress from olfactory hallucinations and possible paranoid delusions." (Tr. at 817.) In Coyne's opinion, Plaintiff suffers from PTSD, dysthymia, driving phobia, obsessive compulsive disorder, TMJ, fibromyalgia, joint pain, severe headaches, and other pain, balance, and coordination issues. (Tr. at 817.) Coyne stated that, in her opinion, Plaintiff was disabled due to both mental and physical impairments. (Tr. at 818.)

## C. Hearing Testimony

At the hearing, Plaintiff testified that she stopped working after being involved in a hit-and-run accident. (Tr. at 25.) Plaintiff testified that, after the accident, she started having all kinds of pain and has had pain ever since. (Tr. at 25.) Plaintiff testified that she had previously been employed in cleaning, restaurant, and factory positions. (Tr. at 25.)

Plaintiff testified that she currently receives approximately $200 per month in general assistance and lives with a roommate, who does all of the grocery shopping. (Tr. at 25-26, 32; *see also* Tr. at 32.) Plaintiff stated that she helps carry some of the items into the apartment, but, if she carries too much, she has pain the following day. (Tr. at 26.) Plaintiff testified that she does her laundry over the course of two days, leaving the

folding for the second day.  (Tr. at 26.)  Plaintiff stated that she has trouble with her memory and will leave burners on in the kitchen.  (Tr. at 37.)  Plaintiff also testified that she burns herself every time she cooks and frequently drops things.  (Tr. at 37.)

Plaintiff testified that, when she wakes up in the morning, she feels tired.  (Tr. at 33.)  Plaintiff stated she hardly leaves her apartment.  (Tr. at 26.)  When asked how she spends the day, Plaintiff responded:

> I spend it basically at home.  I read a little bit.  I don't do much.  I eat, watch TV if I see a good show like about an hour or two hours.  Then I read and stay home and sit and if I don't feel good, I just lay down.  That's my life.  Listen to music sometimes.

(Tr. at 27.)  Plaintiff also testified that she showers twice a day because she feels self-conscious about her body odor.  (Tr. at 33.)  Plaintiff testified that she does not socialize with friends or see family and takes the bus to her medical appointments.  (Tr. at 26-27, 33.)

The ALJ then asked Plaintiff about her pain.  Plaintiff testified that she has pain in her legs, hips, hands, eyes, head, neck, and ears, and she is sometimes unable to talk "because [her] face hurts."  (Tr. at 27.)

Plaintiff testified that she also gets panic attacks while driving on highways and icy roads.  (Tr. at 28.)  Plaintiff could not recall when her last attack occurred, but stated that, during the attack, Plaintiff had to stop three or four times because she was unable to drive.  (Tr. at 28.)

When asked about how she gets along with other people, Plaintiff stated that she "like[s] people," but stays home when she is "sick" due to the pain.  (Tr. at 28.)  Plaintiff

testified that most of the time she stays home because she is unable to manage her pain. (Tr. at 28-29.)  Plaintiff explained:

> I have to stay home.  And I don't watch TV, I just relax on bed.  And I stay from my bed to the kitchen, drinking water. And then I feel—every day I feel nauseous and I got a bowel—irritated syndrome so 60 percent is spend in the bathroom.  So my schedule is unpredictable.

(Tr. at 29.)  Plaintiff stated that she takes pain medication, which helps, but the medication takes time to work and causes her to feel tired.  (Tr. at 30.)

Plaintiff testified that she was seeing a psychologist approximately twice per month.  (Tr. at 29.)  Plaintiff testified that she was also taking medication for her mental health and the medication was helping.  (Tr. at 29-30.)

Plaintiff testified that she has trouble lifting and can only manage small bags of groceries.  (Tr. at 30-31.)  Plaintiff stated that, when she lifts things, she gets headaches and has pain in her legs, chest, and shoulders.  (Tr. at 30.)  Plaintiff also stated that she has difficulty walking, cannot walk for long periods of time, limps, and often falls.  (Tr. at 31, 37.)

Plaintiff also stated that she was having difficulty with her neighbors, who would call her names and use pepper spray around her door.  (Tr. at 34-35.)

The ALJ then presented the vocational expert with the following hypothetical:

> Assume a person the claimant's age, education and vocational profile.  Further assume that such a person can perform work at the light exertional level with additional limitations of occasional bending, kneeling, crouching and climbing the stairs only.  Simple instructions.  No production level work pace.  No work at unprotected heights or around dangerous

> machinery and limited interaction with the public and co-
> workers.

(Tr. at 40.)  The vocational expert testified that this hypothetical individual could perform cleaning/housekeeping work.  (Tr. at 40-41.)

Plaintiff's counsel added to the hypothetical, asking the vocational expert to also assume that this person was unable to maintain attention for two-hour periods.  (Tr. at 42.)  The vocational expert testified that such a person would be precluded from competitive employment.  (Tr. at 42.)  Plaintiff's counsel then proposed that the hypothetical individual was "unable to remember work-like procedures and understand and remember and carry out very short and simple instructions."  (Tr. at 42.)  The vocational expert testified that such a person would be precluded from competitive employment as well.  (Tr. at 42.)  The vocational expert also testified that more than one absence per month would preclude competitive employment.  (Tr. at 42.)

### D. Decision of the ALJ

The ALJ found and concluded that Plaintiff had not engaged in substantial gainful activity since March 14, 2008; Plaintiff has the severe impairments of fibromyalgia, insomnia, PTSD, anxiety disorder, depression, obsessive compulsive disorder and somatic disorder; and these impairments, when considered individually or in combination, do not meet or medically equal one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1.  (Tr. at 11-12.)  The ALJ found that Plaintiff had the residual functional capacity to perform light work with the following limitations: "occasional bending, kneeling, crouching, and climbing of stairs only; simple instructions; no

production level work pace; no work at unprotected heights or around dangerous machinery; and limited interaction with the public and co-workers." (Tr. at 13.) In consideration of Plaintiff's age, level of education, work experience, light residual functional capacity and limitations, the ALJ concluded that Plaintiff was capable of performing her past relevant work as a cleaner/housekeeper and, therefore, Plaintiff has not been under a disability, as defined in the Social Security Act, since March 14, 2008. (Tr. at 17-18.)

In reaching his decision, the ALJ found that, while Plaintiff's impairments could reasonably be expected to cause her symptoms, Plaintiff's credibility concerning the intensity, persistence, and limiting effects of these symptoms were not wholly credible. (Tr. at 14.) Despite Plaintiff's history of chronic pain, the ALJ noted that Plaintiff was able to walk and had full strength in most of her extremities. (Tr. at 14.) Further, diagnostic testing did not substantiate Plaintiff's complaints of muscle tenderness. (*See* Tr. at 14.) The ALJ concluded that "[t]he psychiatric basis for the claimant's pain had some support in the form of a litany of medical complaints with no definitive diagnosis in the record." (Tr. at 15.)

The ALJ gave some weight to the opinion of Dr. McPartlin concerning the lack of objective findings to support Plaintiff's complaints. (*See* Tr. at 15, 17.) The ALJ noted that Dr. McPartlin observed "no pain-related behavior . . . when the physician touched the tender areas in question or when the claimant was asked to sit, bend, and stand." (Tr. at 15.) The ALJ determined, however, that Dr. McPartlin's "opinion as to the presence of

the claimant's physical impairments" lacked support in the medical evidence of record. (Tr. at 17.)

As for Coyne, the ALJ noted that she was not an approved medical source, but gave her opinion "very limited weight" based on the length of the treatment relationship. (Tr. at 17.) The ALJ concluded, however, that Coyne's opinion was not supported by evidence in the record from approved medical sources. (Tr. at 17.)

### III. Analysis

#### A. Standard of Review

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011). "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." *Id.* This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Id.* If the ALJ's decision is supported by substantial evidence in the record as a whole, reversal is not warranted despite the fact that some evidence may support a different conclusion or substantial evidence exists to support an opposite conclusion. *Id.*; *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009). This Court "do[es] not re-weigh the evidence presented to the ALJ and . . . defer[s] to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Gulliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citation omitted).

Titles II and XVI of the Social Security Act provide benefits to disabled individuals.  *See* 42 U.S.C. §§ 423(a) (discussing eligibility for DIB), 1382 (discussing eligibility for SSI).  An individual is considered to be disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); *see id.* § 1382c(a)(3)(A).  This standard is met only if a claimant has a severe physical or mental impairment, or impairments, that renders her unable to do her previous work or "any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. §§ 404.1520, 416.920.  The ALJ "consider[s] whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work."  *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010); *see also* 20 C.F.R. §§ 404.1520(a)(4), 414.920(a)(4).  In general, the burden of proving the existence of disability lies with the claimant.  20 C.F.R. §§ 404.1512(a), 416.912(a).

**B.  Cross Motions for Summary Judgment**

Plaintiff argues that (1) the ALJ erred by concluding that her psychologist, Coyne, was not an "acceptable medical source" and placing "very limited weight" on Coyne's opinion, and (2) the record lacked substantial evidence to support that Plaintiff was only

moderately limited in her daily activities; had only moderate difficulties maintaining concentration, persistence, and pace; and improved with therapy and medication. (Pl.'s Mem. in Support of Summ. J. at 16-28, Docket No. 10.)

The Commissioner contends that (1) the ALJ properly developed the record; (2) any error regarding Coyne's status as an acceptable medical source is harmless; (3) substantial evidence in the record supports the ALJ's determination that Plaintiff's mental impairments did not meet or medically equal a listing; and (4) substantial evidence supports the ALJ's finding that Plaintiff was not disabled because she could perform her past relevant work. (Def.'s Mem. in Support of Summ. J. at 10-21, Docket No. 17.)

### 1. Treatment of Coyne's Opinion

The regulations require the ALJ to consider all medical opinions in the record. 20 C.F.R. §§ 404.1527(b), (c), 416.927(b), (c). "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).

### a. Acceptable Medical Source

Treating sources include physicians, psychologists, and other acceptable medical sources with a present, ongoing treatment relationship with the claimant or have had such a relationship in the past. 20 C.F.R. §§ 404.1502, 416.902. The regulations expressly state that "licensed or certified psychologists" are an acceptable medical source. 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2).

43

Plaintiff argues that the ALJ incorrectly identified Coyne as a "therapist" and Coyne's opinion should have received controlling weight because (1) Coyne is a licensed psychologist who has a long-term treating relationship with Plaintiff, (2) Coyne's opinion is consistent with Coyne's own records and other evidence of record, and (3) Coyne's records "are the only mental health records in the file from [an] 'acceptable medical source[].'" (Pl.'s Mem. in Support of Summ. J. at 16-22.)

The ALJ noted that Plaintiff was seen by "Paula Coyne, M.A., L.P." and accorded Coyne's opinion "very limited weight" because "[t]he therapist is not recognized as an approved medical source under Social Security rules." (Tr. at 16, 17.) Coyne is a licensed psychologist.[27] (T. at 818.) Coyne treated Plaintiff for approximately two years. (*See* Tr. at 818, 829.) Because Coyne is a licensed psychologist who had a past treating relationship with Plaintiff, she is an acceptable medical source. Therefore, the ALJ erred as a matter of law in concluding Coyne was not an acceptable medical source.

### b. Weight of Medical Opinion

While Coyne is an acceptable medical source, her opinion as a treating source is not automatically given controlling weight. Accordingly, the Commissioner argues that "[t]here is no indication that the ALJ would have decided the case differently if he had found [Coyne] to be an acceptable medical source" and, therefore, any error by the ALJ as to Coyne's status was harmless. (Def.'s Mem. in Supp. of Summ. J. at 14.) *See*

---

[27] Part of the confusion may have been caused by the form used at the United Family Practice Health Center to document psychotherapy progress notes. Among other things, the form has spaces for the patient's name and date of birth and the date of the appointment. (*See, e.g.*, Tr. at 867, 869, 871, 873.) There is also a space for "[t]herapist," indicating the treatment provider. (*See, e.g.*, Tr. at 867, 869, 871, 873.) Plaintiff's records read: "Therapist: Paula Coyne, MA, LP." (*See, e.g.*, Tr. at 867, 869, 871, 873.)

*Brueggmann v. Barnhart*, 348 F.3d 689, 695-96 (8th Cir. 2003) (error is harmless when "the ALJ would have reached the same decision denying benefits, even if he had followed the proper procedure by giving due weight to the medical evidence").

"The medical opinions of treating sources on the nature and severity of a claimant's impairments are given more weight than non-treating sources and are even given controlling weight if certain conditions are met." *Lacroix v. Barnhart*, 465 F.3d 881, 885 (8th Cir. 2006) (quotation omitted). This is because a treating source is likely the "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the medical findings alone or from reports of individual examinations, such as consultative examinations . . . ." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir. 2008).

A treating source's opinion will be given controlling weight when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "For a medical opinion to be well-supported by medically acceptable clinical and laboratory diagnostic techniques, it is not necessary that the opinion be fully supported by such evidence. Whether a medical opinion is well-supported will depend on the facts of each case." Social Security Ruling, SSR 96-2p, *Policy Interpretation Ruling Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions*, 1996 WL 374188, at *3 (July 2, 1996). The ALJ "cannot decide a case in reliance on a medical opinion without some reasonable support for the opinion." *Id.* The ALJ must

give "good reasons" for the weight given to a treating sources opinion.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Brown v. Astrue*, 611 F.3d 941, 951 (8th Cir. 2010).

When evaluating any medical opinion, the ALJ is to consider whether (1) the source has examined the claimant;  (2) a treatment relationship exists between the source and the claimant, including the length of the treatment relationship, frequency of the examination, and nature and extent of the treatment relationship; (3) the source's opinion is supported by evidence; (4) the source's opinion is consistent with the record as a whole; (5) the source is a specialist in the area; and (6) other factors tend to support or contradict the source's opinion.  20 C.F.R. §§ 404.1527(c), 416.927(c).  "Not every factor for weighing opinion evidence will apply in every case."  Social Security Ruling, SSR 06-03p, *Titles II and XVI: Considering Opinions and Other Evidence From Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies*, 71 FR 45593-03, 45595 (Aug. 9, 2006).

Coyne treated Plaintiff on a regular basis, approximately one to two times per month, between 2008 and 2010.  (Tr. at 820.)  During this period, Coyne observed Plaintiff's condition deteriorate and her thought patterns become more distorted.  (Tr. at 820, 822, 828.)  At one point, Coyne referred Plaintiff to Dr. Brian for medication.  (Tr. at 316-17.)  While at times Plaintiff reported that she was feeling better with medication, (*see, e.g.*, Tr. at 308, 811, 814), Coyne consistently described Plaintiff's functioning between fair and poor, (*see, e.g.*, Tr. at 308, 312, 314, 316, 318, 842, 844, 846, 849, 851, 853, 855, 857, 859, 861, 863, 865, 867, 869, 871, 873), and Dr. Brian noted that

Plaintiff's depression was not as improved as Dr. Brian had hoped, (Tr. at 801). *See Cox v. Barnhart*, 345 F.3d 606, 609 (8th Cir. 2003) ("It is possible for a person's health to improve, and for that person to remain too disabled to work.").

In discounting Coyne's opinion, the ALJ stated that her "opinion is of some value based on her treatment history with the claimant, [but] her opinion is unsupported by evidence provided by the approved medical sources in the record" and any "determination as to the claimant's ability to work is reserved to the Commissioner." (Tr. at 17.) The Commissioner is correct that the ultimate question of whether a claimant is disabled "is not the type of medical opinion to which the Commissioner gives controlling weight." *Brown v. Astrue*, 611 F.3d 941, 952 (8th Cir. 2010) (quotation omitted). It is difficult, however, to identify the medical evidence supposedly contradicting Coyne's opinion.

At one point, the ALJ cites notes from "Dr. Vargas" in 2005, stating that although Dr. Vargas prescribed antidepressant medication, "Dr. Vargas opined that the claimant did not actually need the medication." (Tr. at 16.) First, records from 2005 fall outside the relevant period; Plaintiff claims that she was under a disability beginning in March 2008. *See* 20 C.F.R. §§ 404.1512(d), 416.912(d) (stating Commissioner will develop claimant's medical history "for at least the 12 months preceding the month in which you file your application unless there is a reason to believe the development of an earlier period is necessary"). Second, only one of the citations is a note from Dr. Vargas in which, rather than stating that Plaintiff does not need medication, Dr. Vargas recommends that Plaintiff be placed on medication. (Tr. at 16, 668 ("Antidepressants

recommended, pt feels doesn't need → I discussed that these meds sometimes used for pain management.").  The other citation is to notes from Dr. Vollmer, also from 2005, in which Dr. Vollmer notes that Plaintiff denies depression, but Dr. Vollmer recommends that Plaintiff take Cymbalta, which is used to treat depression and anxiety as well as pain and tingling from fibromyalgia.  *Duloxetine*, PubMed Health, Nat'l Ctr. for Biotechnology Info., http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000274/ (last visited September 8, 2012) (listing Cymbalta as a brand name for duloxetine).

The Commissioner asserts that Coyne's completion of a mental impairment questionnaire in June 2010 regarding Plaintiff's condition is contradicted by the findings of Coyne's April 2008 initial intake assessment and mental status examination.  (Def.'s Mem. in Supp. of Summ. J. at 16-17.)  But, as Plaintiff points out, "[i]t would certainly be surprising if [] Coyne's observations and opinions regarding [Plaintiff] two years later, after having seen [Plaintiff] in thirty-nine (39) intervening individual psychotherapy sessions, had not varied at all from her initial impressions."  (Pl.'s Reply at 6, Docket No. 18.)  Even during the initial assessment, Coyne noted that Plaintiff was "clearly experiencing some symptoms of depression and marked anxiety which are affecting her functioning."  (Tr. at 322.)  In the intervening two years, Coyne observed Plaintiff's condition deteriorate as Plaintiff's thinking [] bec[a]me distorted with paranoia, bizarre assumptions, and loose associations," (Tr. at 820), and Plaintiff had increasing delusional experiences both as to her personal body odor and the actions of others, (Tr. at 817, 820, 828, 843, 879, 881).

Moreover, Coyne did more than simply complete a checklist when filling out the mental impairment questionnaire. The questionnaire contains many handwritten notes explaining her opinions and also refers to a letter Coyne wrote just the day before regarding Plaintiff's condition. (*See* Tr. at 817-18, 820-25.)

Given Coyne's extensive treatment relationship with Plaintiff as well as the lack of substantial inconsistent evidence in the record, the ALJ's cursory explanation for according Coyne's opinion "very limited weight" is not sufficient. On this record, the Court cannot conclude that the ALJ would have made the same determination regarding the nature and severity of Plaintiff's impairments had he properly viewed Coyne's opinion as that of an acceptable medical source. Therefore, this matter is remanded to the ALJ for an evaluation of Coyne's opinion pursuant to the proper legal standard alongside other evidence of record.

## 2. Met or Medically Equaled a Listed Impairment

In light of remand, the Court need not address Plaintiff's arguments as to whether the ALJ erred in determining that Plaintiff did not meet or medically equal a listed impairment as that determination will necessarily include an evaluation of Coyne's opinions concerning the functional limitations Plaintiff has due to her impairments. *See* 20 C.F.R. §§ 404.1520a(b), (c), 416.920a(b), (c). The determination of whether Plaintiff meets or medically equals a listed impairment, however, illustrates the importance of evaluating Coyne's opinion under the appropriate legal standard.

There is no dispute that Plaintiff satisfies the "A" criteria under listings 12.04 (affective disorders), 12.06 (anxiety-related disorders), and 12.07 (somatoform

disorders).  Plaintiff must, however, satisfy both the "A" and "B" criteria in order to meet or medically equal a listed impairment.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A). For each of these listings, the "B" criteria requires the ALJ to find two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of extended decompensation.  20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04(B), 12.06(B), 12.07(B).  A "marked limitation" is more than a moderate limitation, but less than a severe limitation and "may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C).

The ALJ has already found that Plaintiff has marked difficulties with social functioning.  (Tr. at 12.)  The ALJ also found that Plaintiff has moderate difficulties with activities of daily living and maintaining concentration, persistence, or pace, (Tr. at 12), and the Commissioner asserts substantial evidence in the record supports each of these findings, (Def.'s Mem. in Supp. of Summ. J. at 11-13).  Coyne opined that Plaintiff has extreme limitations in each of these categories.  (Tr. at 824; *see* Tr. at 822-23; *see also* Tr. at 817-18.)  The ALJ found Plaintiff to have greater limitations in these areas than either Dr. Kang or Dr. Conroe, which, at the very least, suggests the persuasiveness of Coyne's opinion.  While the ALJ will need to consider Coyne's opinion in conjunction with all other evidence in the record on remand, proper evaluation of Coyne's opinion may result in an additional "marked" finding, qualifying Plaintiff for benefits.

In sum, on this record, this Court simply cannot conclude that the ALJ's decision would have been the same even if he had considered Coyne to be an acceptable medical source. *See Brueggmann*, 348 F.3d at 695-96.

### 3.  Ability to Perform Past Relevant Work

The determination of whether Plaintiff meets or medically equals a listed impairment occurs at the third step of the disability evaluation process.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  The determination of Plaintiff's ability to perform her past relevant work occurs at step four.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  As previously stated, this is a sequential evaluation process. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Because of the sequential nature of this process, this Court declines to engage in speculative assumptions to address whether the record contains substantial evidence to support the ALJ's findings concerning Plaintiff's residual functional capacity and her ability to perform past relevant work.  Therefore, the Commissioner's motion for summary judgment is denied.

### IV. Conclusion

Based on all of the files, records, and proceedings herein and for the reasons set forth above, Plaintiff's motion for summary judgment (Docket No. 9) is granted in part and this matter is remanded for further consideration consistent with this Order and Memorandum pursuant to the fourth sentence of 42 U.S.C. § 405(g).  The Commissioner's motion for summary judgment (Docket No. 16) is denied.

TNL